IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**JAY DREVERS**,

       Plaintiff,

       v.

**MICHAEL J. ASTRUE**,
**Commissioner of Social Security,**

       Defendant.

Case No. 6:11-cv-253-SI

**OPINION AND ORDER**

David B. Lowry
9900 S.W. Greenburg Road, Suite 130
Portland, Oregon 07223
       Attorney for Plaintiff

Amanda Marshall
United States Attorney
Adrian L. Brown
Assistant United States Attorney
U.S. Attorney's Office
District of Oregon
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

Lisa Goldoftas
Special Assistant United States Attorney
Social Security Administration
Office of General Counsel
701 Fifth Avenue, Suite 2900
M/S 221A
Seattle, Washington 98104
       Attorneys for Defendant

**SIMON, District Judge.**

Opinion and Order, Page 1

## I.  INTRODUCTION

This is an action to obtain judicial review of a final decision by the Commissioner of the

Social Security Administration ("Commissioner") denying the application of Jay Drevers for

Supplemental Security Income benefits ("SSI"). Plaintiff alleges disability on the basis of bipolar

disorder, carpal tunnel syndrome ("CTS"), back and neck pain and stiffness, headaches,

dizziness, fainting, muscle spasms, depression, anxiety with panic attacks, and hypertension.

The court concludes that Plaintiff has not overcome the presumption of non-disability

arising from the January 29, 2004 denial of Plaintiff's disability claim based on alleged

impairments of hypertension, renal insufficiency, CTS, bipolar disorder, and chest pain. The

court concludes further that the Commissioner's decision in this case is free of legal error and

based on substantial evidence in the record. Accordingly, the Commissioner's decision is

affirmed.

## II.  BACKGROUND

Plaintiff filed an application for benefits on March 29, 2006, alleging disability since

January 3, 2004.[1] His claims were denied initially and upon reconsideration. A hearing was held

---

[1] On January 29, 2004, Administrative Law Judge ("ALJ") Riley Atkins issued a decision
on Plaintiff's application filed January 22, 2002, finding Plaintiff not disabled. Tr. 26-32.
Plaintiff's alleged impairments in that case were hypertension, renal insufficiency, CTS, bipolar
disorder, and chest pain. Tr. 27. The ALJ concluded that Plaintiff had the ability to perform work
at the medium level of exertion, and although Plaintiff could not return to his past work, he could
perform other work in the national economy. Tr. 32.

The unappealed denial of an application for disability benefits operates as issue
preclusion with respect to the finding of non-disability through the date of the prior decision. *See
Chavez v. Bowen,* 844 F.2d 691, 693 (9th Cir. 1988) (principles of *res judicata* apply to
administrative decisions). The earlier denial also creates a presumption of continuing non-
disability with respect to the period after the date of the prior decision. *Lester v. Chater,* 81 F.3d
821, 827 (9th Cir. 1995). The presumption does not apply, however, if there are "changed

Opinion and Order, Page 2

before ALJ John J. Madden. On September 29, 2009, the ALJ issued a decision finding Plaintiff

not disabled. After the Appeals Council denied review on January 26, 2011, the ALJ's decision

became the final decision of the Commissioner. Plaintiff was born in 1947 and was 62 years old

at the time of the hearing. He has a high school education and one year of college. His past

relevant work is as a farm equipment mechanic and hydroelectric machine mechanic helper.

**A.    Medical Evidence**

Plaintiff began treatment with Stephanie Cha, M.D. on January 8, 2003. Tr. 772. Plaintiff

complained of chest pain, but Dr. Cha noted that an angiogram in 2001 had been normal and

concluded that the chest pain was "a stress thing." *Id.* Dr. Cha noted that Plaintiff's hypertension

was controlled with Norvasc, but it was not covered on his insurance, so Dr. Cha changed him to

verapamil. Tr. 772-73. Dr. Cha also noted a diagnosis of "probable bipolar per psych."[2] Tr. 773.

---

circumstances." *Taylor v. Heckler,* 765 F.2d 872, 875 (9th Cir. 1985). The presumption may be
overcome by new facts establishing a previously unlitigated impairment or other apparent error
in the prior determination. *Lester,* 81 F.3d at 827-28. *See also Vasquez v. Astrue*, 572 F.3d 586,
597 (9th Cir. 2009) (although normally ALJ's finding that claimant is not disabled creates a
presumption that claimant continued to be able to work after that date, presumption does not
apply "where the claimant raises a new issue, such as the existence of an impairment not
considered in the previous application.") In this case, Plaintiff alleges some impairments
considered in the prior application (bipolar disorder, hypertension, CTS, back pain, and chest
pain), but also alleges the additional impairments of headaches, dizziness, fainting, anxiety, and
depression.

[2] The ALJ's decision of January 29, 2004, expresses doubts about the existence of
Plaintiff's bipolar disorder. ALJ Atkins found no evidence in the medical record "to support an
actual diagnosis of bipolar disorder. A 'bipolar disorder' has never been diagnosed by any
psychologist or psychiatrist, only a 'rule out' notation. This is not a diagnosis. Interestingly, Dr.
Cha noted a 'bipolar disorder' because a prior county clinic prescribed Depakote, but the clinic
opined no diagnosis." Tr. 30.

Dr. Holly Hoch's psychiatric assessment of November 2, 2004, shows a "provisional"
diagnosis of bipolar disorder and anxiety disorder. Tr. 573. It appears that Ms. Betty Foufos,

On January 14, 2004, Plaintiff saw Dr. Cha for complaints of fatigue and sleepiness over the past month. Tr. 413. Plaintiff attributed these symptoms to medication side effects. He told Dr. Cha that "whenever he is on the treadmill he gets headache and feels dizzy." *Id*. Dr. Cha lowered the dose of verapamil and ordered a thyroid check and a blood test. Dr. Cha wrote that the chest pain was difficult to evaluate "because there is the psychiatric overlay." *Id.*

On February 11, 2004, Dr. Cha noted that another physician had changed Plaintiff's blood pressure medication from verapamil to Procardia XL to address Plaintiff's fatigue. Dr. Cha wrote, "Fortunately patient has done quite well. He feels like his fatigue is much better. He is more energized and he is actually working on refurbishing a room. He also has not had any more chest pain for the past couple of weeks." Tr. 411. Plaintiff said he felt better than he had for the past six months. *Id*. Dr. Cha thought Plaintiff's hypertension not adequately controlled at the current dosage of verapamil, but his "bipolar currently appears to be well controlled." *Id.*

On March 10, 2004, Plaintiff told Dr. Cha he had "been doing fine." Tr. 409. His blood pressure was stable and he denied chest pain. *Id.* On April 8, 2004, however, Plaintiff told Dr. Cha he that since starting Procardia XL, he had headaches, dizziness, and a feeling of pressure on the left side of his face. Tr. 407. Dr. Cha wrote that Plaintiff's blood pressure was "actually well controlled" by medication. *Id.*

Plaintiff saw Dr. Cha on June 10, 2004, complaining of fatigue. Dr. Cha thought the

M.A., who is neither a psychiatrist nor a psychologist, made a diagnosis of bipolar disorder and anxiety disorder on September 13, 2005. Tr. 553. ALJ Atkins found that Plaintiff had been diagnosed with an adjustment disorder, with mixed disturbance of emotions and conduct, by Suzanne Wong, LPC, on April 26, 2002, after Plaintiff sought treatment for anger problems. Tr. 28. The ALJ found that Plaintiff was subsequently treated by Shirley Roffe, M.D. and Dr. Hoch. Tr. 28. Dr. Roffe first saw Plaintiff on June 7, 2002, and gave a "rule out" diagnosis of bipolar spectrum disorder, chronic. She started Plaintiff on Depakote and Risperdal. *Id.*

fatigue "might be part of a psychiatric milieu," but that it could also be a side effect of medication. Tr. 401. On September 8, 2004, Plaintiff told Dr. Cha he was less tired and sleeping less, but felt depressed. Tr. 398. Dr. Cha thought "a lot" of Plaintiff's fatigue was psychiatric, since his hypertension was well controlled. *Id.*

On November 2, 2004, Plaintiff was given a comprehensive psychiatric assessment by psychiatrist Holly Hoch, M.D. Tr. 572-74. Plaintiff reported a history of depression alternating with spells of high energy, increased activity, and decreased need for sleep, but denied such experiences in recent years. Tr. 572. Plaintiff also reported having heard voices since about age seven, usually helpful in nature and not bothersome. *Id.* At times of high stress, however, the voices could become argumentative and loud, making him feel irritable and agitated. *Id.* Plaintiff said he felt uncomfortable around other people, experiencing somatic symptoms such as shortness of breath, dizziness, and chest pressure. *Id.*

Plaintiff stated that he had not "worked officially since about age 30, but has done work in exchange for rent, etc." Tr. 573. Dr. Hoch's mental status examination was unremarkable. She concluded that Plaintiff described symptoms of hypomania and depression, but that he had been "[f]airly stable in the past couple of years on his current medications, though tending toward mild depressive symptoms as well as anxiety." *Id.* On December 2, 2004, Plaintiff reported improvement since changing his antidepressant medication from Zoloft to Celexa, saying he no longer felt sluggish and tired during the day, and had an improved ability to spend time around other people. Tr. 571.

On January 5, 2005, Plaintiff told Dr. Hoch his mood continued to improve: he was helping more around the house and had participated in the holidays, which was "very unusual for him." Tr. 570. Dr. Hoch thought Plaintiff appeared to have obtained significant benefits from Celexa. *Id.* On February 8, 2005, Dr. Hoch noted that Plaintiff had generally been doing well, but was struggling with low mood and anxiety. Dr. Hoch discussed the option of increasing the dose of Celexa. Tr. 568. On March 15, 2005, Dr. Hoch wrote that Plaintiff's depressed mood and anxiety had significantly improved with the higher dose of Celexa. Tr. 566. Plaintiff was planning a trip to Florida to help take care of his mother after surgery, starting at the end of March. *Id.* He was planning to use Xanax for anxiety on the plane. *Id.*

On May 4, 2005, Dr. Hoch noted that Plaintiff said was feeling stressed at home because "he's expected to do more work than he feels up to." Tr. 564. On the same day, Plaintiff was seen for a four-month follow up by Dr. Cha. Tr. 395. He reported doing well. *Id.*

On June 10, 2005, Plaintiff told Dr. Hoch he had been doing well over the previous month, attributing the improvement to Celexa. Tr. 560. His roommate's teenage grandchildren were staying with them for a month, so "life is a little more stressful." *Id.* On August 16, 2005, Plaintiff told Dr. Hoch he was "struggling with some of the difficulties" of a renovation project at the house. Tr. 556. Dr. Hoch observed that Plaintiff's mood was "OK," his affect was congruent, and that he appeared calm throughout the appointment, denying hallucinations. *Id.*

On September 13, 2005, Plaintiff began seeing Betty Foufos, M.A., for counseling every two weeks. Tr. 550-54. Plaintiff told Ms. Foufos that he was in the midst of renovations at home, but spending "most of my time on the couch," because he was unable to go out and deal with other people without becoming tired and overwhelmed. Tr. 550. On September 26, 2005,

Plaintiff told Ms. Foufos that he felt a need to take "mini breaks" during projects when he began to feel nervous or overly stressed, saying the breaks kept him from "going blank." Tr. 548.

On September 28, 2005, Dr. Hoch wrote that Plaintiff reported feeling "more level and sleeping better." Tr. 547. He had taken a break from the renovation project and was continuing individual therapy with Ms. Foufos. *Id.*

On October 4, 2005, Dr. Cha noted that Plaintiff was "doing well, overall." Tr. 390. His left wrist showed positive Tinel's and Phalen's tests, indicative of CTS. *Id.* Dr. Cha wrote that Plaintiff's bipolar disorder and hypertension were stable on current medication. *Id.*

On October 11, 2005, Plaintiff requested and was given a note from Dr. Hoch saying that he was unable to work because of illness. Tr. 542. Plaintiff had requested the documentation to obtain a renewal of food stamps. Tr. 541. On October 21, 2005, Ms. Foufos wrote that Plaintiff had reported "a productive week at home: he completed window installation project x 6 windows, paced himself by putting in one window every other day." Tr. 540. On November 2, 2005, Plaintiff told Ms. Foufos he was anticipating a family reunion for his daughter's wedding. Tr. 539. On November 9, 2005, Plaintiff told Dr. Hoch he was doing better, accomplishing more, and feeling that individual therapy was helping him. Tr. 537. He asked Dr. Hoch to prescribe anxiety medication for the trip to his daughter's wedding in March. On November 30, 2005, Ms. Foufos wrote that Plaintiff reported feeling "engaged" during a holiday dinner that he prepared for the extended family. Tr. 535. The experience was followed, however, by three days of "feeling fragile," which he described as feeling anxious and wanting to withdraw. *Id.*

On January 12, 2006, Dr. Cha again wrote that Plaintiff was "doing well," wearing a left wrist brace that had resolved the numbness in his hand. Tr. 388. Plaintiff reported a "possible

panic attack" that morning, saying he was "kind of dizzy" and felt "unwell." *Id.* Dr. Cha thought this was a "slight flare" of his bipolar disease. *Id.* Plaintiff denied any chest pain or shortness of breath that was "beyond normal." *Id.* On January 18, 2006, Plaintiff told Dr. Hoch he was doing "quite well," saying he had been able to handle social situations "much better." Tr. 533. He said he thought individual therapy had been a good thing for him. *Id.*

On March 16, 2006, Ms. Foufos wrote that Plaintiff reported a "successful family reunion/daughter's wedding," saying he was "able to go without emergency anti-anxiety medication much of the time." Tr. 528. Plaintiff said he felt adequately rested during his stay in Florida. *Id.* On March 22, 2006, Plaintiff told Dr. Hoch he had been in Florida for two weeks and that he "had fun, but it was quite stressful." Tr. 526. Plaintiff reported "getting good benefit from current medications," with no adverse side effects. *Id.* In April 2006, Ms. Foufos assisted Plaintiff with an application for Social Security benefits. Tr. 520-22.

On April 26, 2006, Plaintiff told Ms. Foufos he thought he had been "faking it" during mental health treatments, not revealing "persistent symptoms of amotivation, anhedonia, and lethargy, worse since taking medication." Tr. 519. He said he spent most of the day on the couch. *Id.* At a meeting with Dr. Hoch on the same day, Plaintiff said he had found the Social Security application "extremely exhausting," which had "made him realize[] just how poorly he functions in general." Tr. 517. Plaintiff said he spent most of his time on the couch, with very little motivation to get up and do anything, and feeling exhausted by fairly minimal interaction. *Id.*

On May 10, 2006, Plaintiff told Ms. Foufos he was getting positive results from medication management; he had walked from the library to the clinic and had plans to help a neighbor fix a tractor. Tr. 516. He said he was only able to work for 20-minute periods, however,

before needing to rest. *Id.* On May 17, 2006, Plaintiff told Dr. Hoch he was getting beneficial results from infrequent use of low-dosage Xanax to help with social situations. Tr. 514.

On May 4, 2006, Dr. Cha saw Plaintiff for headaches that had worsened during the past six months. Tr. 386. Plaintiff reported chest pain that was "worse as stress had increased." *Id.* Plaintiff told Dr. Cha the chest pain was "basically a warning that [a] headache is coming." *Id.*

On May 16, 2006, Plaintiff saw Dr. Karleen Swartztrauber for headaches, which had been accompanied during the last six months with a "droopy sense on left face" in the mornings. Dr. Swartztrauber noted Plaintiff's history of "extremely high blood pressure (more than 200/120)." Tr. 382. Examination was normal throughout all systems. Tr. 384. Dr. Swartztrauber offered the following differential diagnoses, in descending order of likelihood: (1) sleep apnea headaches; (2) headaches associated with silent infarcts; (3) medication-induced headaches, possibly from reducing the dosage of Risperdal; and (4) temporal arteritis. Tr. 383-85.

An MRI of Plaintiff's brain done on May 18, 2006, showed "extensive white matter plaques in the periventricular white matter as well as in subcortical regions bilaterally." Tr. 379. The radiologist noted that while most of the plaques were present in a prior study on May 14, 2002, there had been "mild progression in number of the lesions, with some areas having become more confluent during this interval." *Id.* There was, however, no sign of recent infarct. *Id.*

On May 22, 2006, Plaintiff was seen by pulmonologist Daniel Loube, M.D. for evaluation of his hypersomnia. Tr. 376-78. Dr. Loube wrote that Plaintiff had a five-year history of "progressive hypersomnia to the point that he is sleeping nine or ten hours at night . . . and is tired upon awakening and still naps for two or three hours during the day. . . ." Tr. 376. Plaintiff said that when he was in stressful situations, such as being in the grocery store, he might "need

to sit down and take a nap," and that when he was working, he had to lie down every few hours for about 30 minutes. *Id.* Plaintiff also reported visual and auditory hallucinations, but said "these do not occur in connection with sleepiness." *Id.* Dr. Loube noted that reducing the dosage of Risperdal, the psychiatric medication Plaintiff was taking, had not been effective in decreasing Plaintiff's daytime sleepiness. *Id.* Dr. Loube recommended a sleep study. Tr. 377.

On May 24, 2006, Ms. Foufos wrote that Plaintiff reported feeling more comfortable during counseling sessions and having increased motivation to perform tasks at home. Tr. 513.

On June 16, 2006, internist Sharon Eder, M.D. performed a records review on behalf of the Commissioner and assessed Plaintiff's physical capacity. Tr. 421-28. She opined that Plaintiff was able to lift up to 50 pounds occasionally and 25 pounds frequently; stand and/or walk for a total of about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. She found no limitations on Plaintiff's ability to push or pull, climb, stoop, kneel, crouch, or crawl, but found that his ability to balance was limited.

On June 19, 2006, Bill Hennings, Ph.D., performed a records review on behalf of the Commissioner and assessed Plaintiff's mental functioning. Tr. 429-45. Dr. Hennings opined that Plaintiff was impaired by bipolar disorder, depression, and anxiety, but that he had only mild restriction in his Activities of Daily Living ("ADLs"). Dr. Hennings thought Plaintiff was moderately limited with respect to his ability to: (1) maintain social functioning; (2) maintain concentration, persistence, or pace; (3) remember and carry out detailed instructions; and (4) interact appropriately with the general public. Tr. 443-445.

On June 19, 2006, Dr. Loube wrote that the sleep study did not indicate sleep-disordered breathing, but did show periodic limb movements complicating about 50 percent of Plaintiff's

sleep. Tr. 495. He recommended that Plaintiff be started on Requip to treat the limb movements. *Id.*

At a meeting on June 21, 2006, Plaintiff told Ms. Foufos that he was a "good faker," adding that after individual counseling sessions and appointments with Dr. Hoch, it took him two days to recover. Tr. 512. Plaintiff explained that he felt he needed to present as "normal," despite continued fears of "exploding" and revealing hypomanic outbursts. *Id.* On June 29, 2006, Plaintiff told Dr. Hoch he was "not doing particularly well" because of "many stressors." Tr. 510. Among them was the possibility that the woman Plaintiff lived with would lease her property, thereby reducing her need for help from him, or even sell the house, leaving Plaintiff nowhere to go. *Id.* Another stressor was that his Social Security application had been denied.  *Id.*

Dr. Swartztrauber wrote on July 6, 2006, that Requip had helped Plaintiff's "sleep habits tremendously." Tr. 487. Nitroglycerin for chest pain had also been added to Plaintiff's medication regimen. *Id.*  On July 19, 2006, Dr. Loube noted that Plaintiff had had "excellent clinical response" after taking Requip for a month. Tr. 484. He reported being "now markedly alert during the day," and felt "his sleep is much less fragmented and much more restorative." *Id.* His daytime functioning was adequate and hypersomnia was "no longer an issue." *Id.*

On July 27, 2006, Dr. Cha wrote that Plaintiff was "doing well," and that the Requip was "helping him sleep and he feels very well rested in the morning" no longer sleeping during the day. Tr. 482. Dr. Cha wrote that Plaintiff continued to have chest pain and shortness of breath with exertion and that he had a "history of atypical chest pain." *Id.* An exercise stress echocardiogram performed on August 7, 2006, was normal. Richard Crone, M.D. wrote that "overall, this is a likely normal stress echo with low suspicion for active ischemia." Tr. 452.

On August 9, 2006, Plaintiff told Dr. Hoch that for the last two weeks he had become more "stressed out," as a result of having his roommate's grandchildren in the house. Tr. 505. Before that time, however, he had been "engaging fairly well and able to accomplish some things." *Id.* On the same day, Plaintiff told Ms. Foufos he felt exhausted after about 20 minutes of activity. Tr. 504. On August 23, 2006, Ms. Foufos spent half of Plaintiff's appointment generating and reviewing paperwork related to Plaintiff's Social Security claim. Tr. 503.

On August 11, 2006, Dr. Cha completed a questionnaire, drafted by Plaintiff's attorney, on Plaintiff's ability to do work-related activities. Tr. 575-82. Dr. Cha provided her diagnoses of hypertension, renal insufficiency, bipolar disorder, anxiety disorder, chest pain, fatigue, and headache. Tr. 576. Dr. Cha opined that Plaintiff could stand and walk less than two hours in an eight-hour day; sit about two hours; sit about an hour before needing to change position; stand about 10 minutes before changing position; and walk about five minutes at a time. Tr. 579. She also opined that Plaintiff would have to lie down at unpredictable intervals. *Id.* Asked what medical findings supported these limitations, Dr. Cha wrote, "Patient report." *Id.* Dr. Cha did not identify any medical findings that supported her opinions. Tr. 580-81.

On August 30, 2006, Dr. Loube noted that Plaintiff had stopped taking Requip about two weeks earlier, because it gave him a metallic taste in his mouth, and that Plaintiff had had a recurrence of nonrestorative sleep and hypersomnia. Tr. 478. Dr. Loube wrote that Plaintiff "would like to find an alternative medicine to Requip so that he might feel better at night and during the day." *Id.* On September 27, 2006, Dr. Loube started Plaintiff on Sinemet. Tr. 684.

On September 1, 2006, Ms. Foufos completed a questionnaire prepared by Plaintiff's attorney. Tr. 583-90. Dr. Hoch completed the same questionnaire on September 20, 2006,

referring to Ms. Foufos's treatment records and indicating that Dr. Hoch agreed with

Ms. Foufos's responses. Tr. 591-98.

Ms. Foufos wrote that Plaintiff's diagnoses were Bipolar II Disorder and Anxiety

Disorder. Tr. 583. Ms. Foufos checked boxes indicating that Plaintiff had 19 associated

symptoms, including anhedonia, decreased energy, feelings of guilt or worthlessness,

generalized anxiety, somatization, mood disturbance, difficulty thinking or concentrating,

psychomotor agitation or retardation, persistence disturbances of mood or affect, apprehensive

expectation, emotional withdrawal, perceptual or thinking disturbances, hallucinations, flight of

ideas, lability, vigilance and scanning, recurrent and intrusive recollections of traumatic

experiences, sleep disturbances, and recurrent panic attacks. Tr. 584. Ms. Foufos added that

"client describes disabling anxiety," "sense of dissociation and 'need' to leave public places," as

well as a "long history of auditory hallucinations managed by medication." Tr. 585. She wrote

that Plaintiff's primary complaints were "anhedonia, lethargy, sleep disturbance, and loss of

previous ability to sustain work of any sort without need to rest after about 30-30 minutes," and

that he described "[d]isrupted focus and 'other-worldliness' dissociation." *Id.* Ms. Foufos also

stated, "Client reports a period of marked decline, impairment of functioning with onset at about

age 30-33," including auditory hallucinations. *Id.* In response to a question about Plaintiff's

ability to sustain employment, Ms. Foufos wrote, "Given client's presentation of symptoms, it is

not likely that he could sustain consistent, competitive employment." Tr. 587.

On the section of the questionnaire asking Dr. Hoch what clinical findings demonstrated

Plaintiff's mental impairments, she wrote, "No specific test results. Observations consistent with

patient self-report of symptoms." Tr. 593. Dr. Hoch did opine that Plaintiff would be likely to

have substantial difficulty getting along with members of the public: "Patient isolates even when around a few people. Anxiety would increase and could impair ability to interact appropriately over extended period of time." Tr. 594. Dr. Hoch wrote that Plaintiff "could not sustain competitive work." Tr. 595. On a chart, Dr. Hoch circled "marked" to designate Plaintiff's limitations in maintaining social functioning and "frequent" in the category of deficiencies of concentration, persistence or pace. Tr. 597.

On September 20, 2006, Dr. Hoch recorded that Plaintiff had recovered from the stress of having grandchildren around the home, but "there is new stress in the form of increased work during canning season." Tr. 863. On November 1, 2006, Dr. Hoch wrote that Plaintiff said his mood was "pretty good," and that he was feeling more relaxed in general. Tr. 861. Plaintiff planned to take Xanax at Thanksgiving, "when they have numerous guests coming over." *Id.* On December 5, 2006, Plaintiff told Dr. Hoch he was handling stress at home. Tr. 859. Plaintiff was going to Florida in January to be with his mother during knee surgery and was looking forward to the trip. *Id.* On February 1, 2007, Plaintiff reported having a "good trip to Florida," saying he had "enjoyed visiting with his mother." Tr. 857.

On January 3, 2007, Plaintiff saw Dr. Cha for general followup. Tr. 681. Plaintiff reported doing well overall, except for right-sided headache, alleviated with aspirin. *Id.* Plaintiff was trying to lose weight, with "a little more exercise, tiling a shower, climbing stairs more." *Id.* Dr. Cha wrote that Sinemet seemed to be "doing a reasonable job for him." *Id.* On February 1, 2007, Plaintiff told Dr. Hoch he had had a good trip to Florida and had enjoyed visiting with his mother. Tr. 857. He was sleeping well, feeling awake and energetic during the day. *Id.* His mood had been stable and he had not been bothered by hallucinations for "quite some time." *Id.*

On February 7, 2007, Dr. Loube wrote that Plaintiff had been taking Sinemet for the past six months and was tolerating it well without side effects. Tr. 678. Dr. Loube wrote that Plaintiff's sleep was "excellent," and that he awoke feeling refreshed. *Id.* He reported feeling alert during the day with no residual hypersomnia. *Id.* He was "otherwise doing well." *Id.*

On March 22, 2007, Dr. Hoch wrote that Plaintiff reported working on his project list, although he still struggled with feeling worn out after 30 minutes. Tr. 855. His mood was stable and he used Xanax only rarely. *Id.* Plaintiff said he continued to "get good benefit from his medications." *Id.* On May 2, 2007, Dr. Hoch noted that Plaintiff reported being able to work up to 60 minutes at a time and "getting some satisfaction out of life." Tr. 925. Plaintiff said he "still isolates most of the time but is finding he is socializing better with the few people that he does see." *Id.*

On May 3, 2007, Plaintiff had a colonoscopy in which a polyp was removed and an esophagogastroduodenoscopy and biopsy. Tr. 615-17. Gastroenterologist Michael Sheffield noted Plaintiff's report of fecal incontinence, but noted that because of a normal physical examination, normal tests, and unremarkable laboratory results, he thought the incontinence was secondary to Plaintiff's psychiatric disorder. Tr. 623. Dr. Sheffield recommended Prilosec twice a day. *Id.*

On June 13, 2007, Plaintiff saw Dr. Cha for a routine follow-up. Tr. 670. Plaintiff said he was "doing okay," with improved sleep. *Id.* He said, however, that his vertigo had become worse, with a feeling of "fuzziness" when fatigued and a "sense of disequilibrium" when squatting, although he "feels okay when he is standing or sitting." *Id.*

On July 11, 2007, Plaintiff told Dr. Hoch he was feeling well because he and his partner

had sold the farm with an agreement that they could continue to live there, "which has improved their financial situation significantly." Tr. 923. Plaintiff said there had also been "less pressure on him to do work around the house since now they can afford to hire people to do things." *Id.* He was sleeping at night, feeling awake during the day, and did not need naps. *Id.*

On July 12, 2007, Plaintiff saw Dr. Swartztrauber for complaints of increasing dizziness and headaches over the past six months. Tr. 651. Imaging revealed no change in Plaintiff's white matter disease. *Id.* Physical examination was normal except for tremor in the left hand. *Id.*

Dr. Swartztrauber performed nerve conduction studies on August 9, 2007, which revealed moderate median nerve neuropathy on the left and mild slowing on the right. Tr. 604. On October 12, 2007, Plaintiff saw Thomas Croy, M.D. to be evaluated for carpal tunnel release surgery. *Id.* Dr. Croy noted "some high blood pressure" and "occasional indigestion, headache, anxiety, depression," as well as a diagnosis with bipolar disorder "about five years ago." *Id.* Otherwise, Dr. Croy wrote, "[n]o major organ system problems." *Id.* Physical examination was unremarkable except for the indications of CTS on the left. Tr. 605. Dr. Croy performed the release. Tr. 606.

On September 11, 2007, Dr. Cha saw Plaintiff for abnormal creatinine levels. Tr. 643. Dr. Cha wrote,

> The creatinine has been about 2.1 and has been stable over the past several years. In fact in reviewing the medical chart, creatinines have been between 1.7 and 2.1 since 1999. I believe he did have a nephrology evaluation when he was hospitalized in 2001 for chest pain and hypertensive urgency. . . . Renal insufficiency thought to be secondary to years uncontrolled hypertension [sic], which has been well controlled after giving patient on [sic] appropriate psychiatric medicines.

Tr. 643. On December 5, 2007, Plaintiff told Dr. Hoch he went to Eugene for Thanksgiving and

"was surprised to find that he had a good time." Tr. 914.

On January 16, 2008, Dr. Hoch wrote that Plaintiff reported an increase in auditory hallucinations after a reduction in the dosage of Risperdal, but said it was tolerable and improving during the past two weeks. Tr. 912. Plaintiff preferred to continue on the lower dose because he believed the higher dose caused weight gain. *Id.* A chart note from Dr. Hoch dated February 14, 2008 records "a rough few weeks" for Plaintiff. Tr. 910. Plaintiff said he did not "want to cope with anything" and was finding it difficult to complete projects. *Id.* He also complained of "chatter in his head, making it more difficult for him to focus." *Id.* On May 1, 2008, Plaintiff told Dr. Hoch he had just returned from a three-week visit with family in Florida "which was enjoyable but also stressful." Tr. 908. He was being bothered by auditory hallucinations. *Id.*

On June 6, 2008, Plaintiff told Dr. Cha he was doing well. Tr. 636. On June 12, 2008, Dr. Hoch wrote that Plaintiff said he was doing "reasonably well," not feeling overwhelmed, and with voices "at a minimum." Tr. 906. He was sleeping about eight hours a night and "feeling well rested with some energy during the day." *Id.* On September 9, 2008, Dr. Cha wrote that Plaintiff was "doing well," with "no complaints." Tr. 625. Physical examination was unremarkable. *Id.*

Between October 1, 2007, and December 1, 2008, Plaintiff was seen by Firas Khoury, M.D. for kidney disease progression. Tr. 775-92. On December 1, 2008, Plaintiff told Dr. Khoury he had stopped taking Sinemet for restless legs and Inderal for hypertension. *Id.* Plaintiff reported feeling "great," denying joint pain, GI or GU symptoms, chest pain, or shortness of breath. *Id.* Dr. Khoury thought Plaintiff had "Stage III bordering stage IV [sic]

chronic kidney disease with stable serum creatinine likely secondary to underlying lithium

toxicity as he was treated with lithium in the past." Tr. 776. Dr. Khoury wrote that Plaintiff's

hypertension was "well controlled," with Plaintiff's blood pressure remaining at 130/80. *Id.*

In July 2008, Utako Sekiya, M.D. began providing mental health treatment in place of

Dr. Hoch, continuing to supervise Ms. Foufos. Tr. 818. On July 24, 2008, Plaintiff expressed to

Dr. Sekiya "some concerns" about his partner's having a party at their house. Tr. 904. Dr. Sekiya

wrote that Plaintiff "no longer endorses positive psychotic symptoms except for persisting

auditory hallucinations" that did not make him particularly uncomfortable. *Id.* In a chart note

dated September 4, 2008, Dr. Sekiya wrote, "Today he reports he went through a stressful event

of inviting 50 people to his house who stayed there over the weekend and 10 of the 50 people

stayed over another long week." Tr. 902. Plaintiff said it was "very stressful for him," saying he

prepared a cake for the guests, told everyone where things were, and then "isolated himself in his

room during this time." *Id.* He took Xanax, but it "took him another week or two to calm down."

*Id.* Plaintiff said he was currently back on his routine, helping his partner with the household and

mowing the lawn. *Id.* Dr. Sekiya assessed Plaintiff on October 16, 2008. Tr. 800-801. Plaintiff

reported "no complaints," saying he felt more relaxed. Tr. 800. He had used Xanax only once

over the previous six weeks. *Id.* He took his medications regularly with no side effects. *Id.*

On October 31, 2008, Plaintiff told Dr. Sekiya he was experiencing increasing hand

tremor, although "not so severe as changing [sic] his quality of life." Tr. 798. Plaintiff told

Dr. Sekiya he had no trouble using utensils, punching in numbers on a telephone, or writing. *Id.*

Plaintiff also said that after an increase of Risperdal two weeks earlier, auditory hallucinations

were "almost 100% gone, which he is very positive about." *Id.* Plaintiff said his sleep had

become deeper and better. *Id.*

On March 3, 2009, Dr. Sekiya wrote that Plaintiff reported some recurrence of restless leg syndrome after discontinuing Sinemet, but that it had resolved. Tr. 882. Plaintiff said the voices were "completely gone," and his hand tremor was managed by Cogentin. *Id.* Plaintiff was planning to fly to Florida to see his mother and his relatives. *Id.* Plaintiff planned to use Xanax to manage anxiety during the flight. *Id.*

On March 17, 2009, Dr. Sekiya completed a questionnaire submitted by Plaintiff's attorney. Tr. 874-881. Dr. Sekiya checked boxes on the questionnaire indicating that Plaintiff had 23 psychiatric symptoms, but noted that the symptoms were "consistent with Bipolar Syndrome [and] are managed with medication." Tr. 875. Dr. Sekiya wrote that Plaintiff did "well on consistent medication regime, includes [sic] mood stabilizer Depakote and antipsychotic Risperdal; also Celexa as antidepressant and Xanax as needed for anxiety. When medicated he reports reduced psychosis." Tr. 876. Dr. Sekiya attributed Plaintiff's hand tremor to Risperdal. Tr. 877.

In Dr. Sekiya's opinion, Plaintiff's prognosis was "guarded–needs to continue medication management and counseling." Tr. 877. Dr. Sekiya opined that Plaintiff's ability to work full time was "very poor," *id.,* and that Plaintiff would likely be absent from work more than four times a month. Tr. 878. Dr. Sekiya checked the box designated "Severe" to characterize Plaintiff's ability to maintain regular attendance at work, perform at a consistent pace without unreasonable rest periods, ask simple questions or request assistance, and deal with normal work stress. Tr. 879. Dr. Sekiya checked the box designated "Marked" to characterize Plaintiff's difficulties in maintaining social interaction and "frequent" to describe deficiencies of concentration,

Opinion and Order, Page 19

persistence or pace. Tr. 880. Dr. Sekiya also checked a box indicating agreement with the statement that Plaintiff had a "[c]urrent history of one or more years' inability to function outside a highly supportive living arrangement," writing, "Client reports some reliance or cues from partner who lives with him (medication monitoring, cues re: nutrition and hygiene.)" Tr. 881.

**B.    Hearing Testimony**

**1.    Plaintiff**

At the hearing, Plaintiff testified that he lived on a farm and did house repairs in exchange for room and board. Tr. 45. He mowed the lawn once a month. Tr. 46. Plaintiff testified that he became hypertensive in January 2004, a condition that had been "semi-controlled this last month, month and a half." Tr. 47. Plaintiff said he became "quite angry" when his blood pressure went up and he had to "use all my calmness to hold it in." *Id.* This occurred once or twice a week, lasted 20-30 minutes or sometimes longer, and required him to go to his room. *Id.* Asked by the ALJ whether he attributed "all that to high blood pressure," Plaintiff answered, "No, I attribute that to the bipolar disease." *Id.* Plaintiff explained that the high blood pressure was not brought under control "until the psychiatric medicines kicked in," which "brought my blood pressure down." Tr. 48.

Plaintiff testified that he had carpal tunnel release in his left hand, but that his right hand also "gets numb and doesn't function." *Id.* Plaintiff said tools tended to fall out of his right hand. *Id.* Plaintiff's attorney asked about the trembling in Plaintiff's hands; Plaintiff answered that it was a side effect of Risperdal, and that it too caused him to drop things. Tr. 49. Plaintiff said his low back was so painful that he was unable to stand for more than about 10 minutes before having to sit down. Tr. 49. When sitting, he was required to lie down after about 45 minutes. *Id.*

Opinion and Order, Page 20

Plaintiff said he had difficulty looking up, down, or from side to side because his neck was stiff and painful. Tr. 49. Plaintiff testified that the stiffness in his neck "affects my thinking processes somehow," giving him "fuzzy brain." Tr. 50.

Plaintiff said he had a history of migraine headaches dating back to the 1960s. Tr. 50. He was currently having headaches that lasted four to five hours, approximately once a month. Tr. 50. Dyslexia caused difficulty with reading. Tr. 52. He experienced dizziness three or four times a day, for five to 20 minutes per episode. Tr. 53. The dizziness caused him to fall once or twice a day. *Id.,* tr. 56. He also experienced severe diarrhea about once a month, and fainted when "very stressed;" he said he had fainted twice on airplanes. Tr. 54. He felt faint about twice a week, which required him to lie down for 30 minutes to an hour. *Id.* Plaintiff testified that when he tried to still the tremor in his right hand, "it travels across and gets into my left hand," and then into his neck. Tr. 55. He had to sit down and "try to get all that stopped." *Id.* The spasms prevented him from being able to write and use small tools. *Id.* He also got chin cramps, "where it just feels like my jaw is being pulled down," and "usually I can't do anything but get up and jump around, and try to move my neck, try to get it loosened." *Id.* Plaintiff said this occurred about once a week and lasted about 30 minutes. Tr. 56. Plaintiff said, "When that is happening, I can't watch TV, I can't read a book. I just take care of my chin." Tr. 56. He also had crying spells "about half the nights," but not during the day. *Id.* He had panic attacks in which he became "overwhelmed," and had to sit on the floor, "or I fall over. And usually I just want to get away from wherever I am." *Id.* Plaintiff had panic attacks once a week and they lasted half an hour to an hour. Tr. 57.

Plaintiff said he had nightmares that left him feeling groggy in the morning, and his ankles and hands became swollen during the night. Tr. 61. He was taking one or two naps a day, for an hour or two, and spent 60-70 percent of the day resting. Tr. 62. Plaintiff attributed some of his sleepiness to medication. Tr. 69. In a given month, he had about 20 "good days" and 10 "bad days." Tr. 64.

### 2.    The Vocational Expert

The ALJ called vocational expert ("VE") Jeffrey Tatalovich. Tr. 75. The ALJ asked the VE to consider an individual of Plaintiff's age and education, able to work at the medium level of exertion (lifting and carrying 50 pounds occasionally and 25 pounds frequently; standing and walking about six hours in an eight-hour workday; sitting about six hours in an eight-hour workday); unable to do fine manipulation with the hands; with the ability to remember and carry out simple, routine tasks of up to three steps; and limited to occasional and brief contact with coworkers and the general public, with no close coordination with coworkers.

The VE ruled out, on the basis of that hypothetical, Plaintiff's past relevant jobs of farm equipment repairer and hydroelectric mechanic helper, as both requiring the ability to do more than simple tasks. Tr. 78. The VE opined that the individual described by the ALJ could work at the occupations of Marker II, DOT 920.687-126,[3] a light duty job; packing line worker, DOT

---

[3] The Dictionary of Occupational Titles ("DOT") is a publication of the United States Department of Labor that gives detailed requirements for a variety of jobs.  The Social Security Administration has taken administrative notice of the DOT.  *Massachi v. Astrue*, 486 F.3d 1149, 1153 n. 8 (9th Cir. 2007). *See* United States Department of Labor, DOT (4th ed. 1991), available at www.occupationalinfo.org/contents.html. The Social Security Administration relies "primarily on the DOT" for "information about the requirements of work in the national economy" at steps four and five of the sequential evaluation process.  SSR 00-4p, 2000 WL 1898704 *2 (SSA) (use of vocational experts and occupational information in disability decisions).

753.687-038, also a light duty job; and bottle packer, DOT 920.685-026. The VE testified that all three jobs required the frequent, but not constant, use of the hands. Tr. 86.

### 3.    Lay Witness Laurel Hood

Plaintiff's neighbor, Laurel Hood, testified for Plaintiff. Tr. 71. She testified that she saw Plaintiff "somewhere between once a week and once a month," and that since January 2004, he did not have the strength to keep moving. Tr. 72. She said he worked very slowly and isolated himself. Tr. 73. She had also noticed that Plaintiff was no longer able to go out and get tractor parts because of anxiety. Tr. 74.

### 4.    Lay Witness Shaffia Richards

Plaintiff's friend and roommate Shaffia Richards submitted a third-party report in which she said she had known Plaintiff for 25 years and that they saw each other every day. Tr. 191. She wrote that Plaintiff "spends many hours on the couch sometimes sleeping, other times just lying down or reading." Tr. 192. She said he needed reminders to change and launder his clothes and shampoo his hair. Tr. 193.

Ms. Richards also reported that Plaintiff was able to mow the lawn, wash dishes, carry out trash, and do laundry, but that he worked slowly and had to be reminded. Tr. 193. He shopped for food, hardware, and clothing two to four times a month, but "always less than 1/2 hour." Tr. 194. She said he read, watched many hours of TV, went to appointments, and made brief trips to the library. Tr. 195. She said Plaintiff had increasingly refused "to be a part of almost any social activity." Tr. 196. Ms. Richards reported that Plaintiff displayed "acute anxiety symptoms even around familiar people," passing out in situations where he was unable to leave, such as on an airplane, and having panic attacks. Tr. 197.

Opinion and Order, Page 23

C.    **The Sequential Evaluation**

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. At step one, the Commissioner determines whether the claimant is engaging in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner proceeds to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert,* 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the impairment is severe, the evaluation proceeds to the third step, where the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert,* 482 U.S. at 140-41. If a claimant's impairment meets or equals one or more of the listed impairments, the claimant is considered disabled without consideration of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity ("RFC") to do other work in consideration of the claimant's age,

education and past work experience. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f),

416.920(f).

**D.      The ALJ's Decision**

At step two, the ALJ found that Plaintiff had the following severe impairments: bipolar

disorder, anxiety disorder, mild degenerative disc disease of the lumbar spine, and hypertension.

Tr. 13. The ALJ found Plaintiff's CTS not severe, because Plaintiff had undergone release

surgery on his left hand that brought him immediate relief, while nerve conduction studies of the

dominant right hand showed only "mild slowing" of the right wrist. *Id.* The ALJ found that the

record did not document any subjective complaints by Plaintiff about his right hand, and did not

support Plaintiff's testimony that he required surgery on his right hand.

At step three, the ALJ found that Plaintiff's physical impairments, alone or in

combination, did not meet or medically equal one of the listed impairments. In addition, the ALJ

concluded that Plaintiff's mental impairments, singly and in combination, did not meet or

medically equal listings criteria because the "paragraph B" criteria were not met.[4] The ALJ

found that Plaintiff had only mild restrictions in ADLs, being able to manage his personal care

and hygiene, prepare simple meals, do laundry, perform small household repairs, take out the

trash, and wash dishes. Tr. 14. The ALJ found Plaintiff moderately limited in social functioning,

based on Plaintiff's report that he tended to avoid most people, but also that he was able to speak

with his landlady five or six days a week, go shopping once or twice a week, manage his own

---

[4] To satisfy "paragraph B" criteria, the mental impairments must result in at least two of
the following: (1) marked restriction of activities of daily living ("ADLs"); (2) marked
difficulties in maintaining social functioning; (3) marked difficulties in maintaining
concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of
extended duration.

finances, drive short distances, and travel to Florida for visits with relatives. *Id.* The ALJ found

that Plaintiff had moderate difficulties with concentration, persistence, or pace. *Id.*

Although Plaintiff reported a history of auditory hallucinations, the ALJ found that more

recent treatment records indicated that his mental condition had stabilized and that the voices

were "completely gone." *Id.* The ALJ noted consistent chart entries that Plaintiff's thought

processes were linear and his attitude cooperative, and that he denied suicidal, homicidal, or

paranoid ideation. *Id.* The ALJ found no episodes of decompensation. Tr. 15. The ALJ noted that

mental health providers repeatedly described Plaintiff's mood as "good," with normal speech and

congruent affect, with the latest evaluation stating that the auditory hallucinations were "100%

gone." Tr. 17.

The ALJ found Plaintiff's statements about the intensity, persistence, and limiting effects

of his symptoms not credible "to the extent they are inconsistent with the above [RFC]

assessment." Tr. 16. The ALJ noted that Plaintiff's subjective complaints were not fully

supported by objective medical findings, including the examination in May 2006, showing

normal gait and normal muscle strength and tone, intact reflexes, sensation, and coordination,

and no memory deficits. *Id.* The ALJ also cited the May 2006 MRI showing severe

periventricular white matter disease with mild progression from the May 2002 study, but no

evidence of intracranial masses "or findings that would suggest acute infarction, hemorrhage, or

edema." *Id.* The ALJ noted that Dr. Swartztrauber attributed the deep white matter to Plaintiff's

history of uncontrolled hypertension, but did not connect Plaintiff's chronic headaches to these

MRI findings, finding instead that Plaintiff's headaches had "no definable cause" and went away

with aspirin. *Id.* The ALJ also relied on the July 2006 records of Dr. Cha, indicating stable vital

signs and a heart rate that was regular without murmurs, rubs, or gallops; the echocardiogram of August 2006 showing only "modest" functional aerobic intolerance and no symptoms of ischemia; and Dr. Crone's characterization of his examination as "normal" with low suspicion for active ischemia. Tr. 17.  The ALJ also cited the normal examination findings of Dr. Khoury in June 2008, noting that Plaintiff stated he felt great and had no complaints. *Id.* The ALJ found this statement "completely inconsistent" with the disabling symptoms alleged by the claimant at the hearing, noting that at one point during the hearing, Plaintiff lay down on the hearing room floor to relieve discomfort, although no treatment provider documented similar complaints during an examination. *Id.*

The ALJ discounted Plaintiff's testimony about mental symptoms based on reports from mental health practitioners describing Plaintiff's mood as good, with normal speech and congruent affect. *Id.* The ALJ noted that although Plaintiff mentioned intermittent auditory hallucinations–usually described as positive and not affecting his mood–the latest evaluation reported that the hallucinations were gone. *Id.* The ALJ also noted that Plaintiff had reported that his sleep had become better, his appetite was stable, and he had no suicidal or homicidal ideation. *Id.*

The ALJ found Plaintiff's credibility further undermined by his admission that he had, at age 20,  ingested amphetamines before reporting for a military draft medical examination and been psychiatrically hospitalized. The ALJ acknowledged that the episode was "quite remote in time," but found that it indicated a "deliberate effort to prevent an accurate assessment of his functional capacity." *Id.*

The ALJ rejected the opinions of Doctors Cha and Hoch and of Ms. Foufos as expressed on the questionnaires provided by Plaintiff's attorney. The ALJ noted that Dr. Hoch "conceded that she could not point to any specific test results, but that the claimant's self-report of symptoms were [sic] consistent with listing level severity." Tr. 17-18. The ALJ noted further that the reports of both doctors and of Ms. Foufos "expressly rel[y] primarily on the claimant's own report and [are] wholly inconsistent with the objective medical findings cited above." Tr. 18.

The ALJ gave little weight to the March 2009 assessment by Dr. Sekiya that Plaintiff demonstrated an inability over the previous year to function outside a highly supportive living arrangement. Tr. 18. The ALJ found the opinion contradicted by Dr. Sekiya's treatment records and observed, "It is difficult to imagine an individual with the functional capacity described by Dr. Sekiya being able to go shopping on a weekly basis, independently operate a motor vehicle, independently manage personal finances, or make a cross-country trip to Florida–all of which the claimant reports doing." Tr. 18.

The ALJ adopted the opinions of Dr. Eder, Dr. Berner, and Dr. Hennings, finding them "generally consistent with the record as a whole." Tr. 19. The ALJ accepted the statements of Ms. Richards as descriptive of her own observations and what she had been told by Plaintiff, but found that her observations did not "provide sufficient support to alter the [RFC] arrived at herein," and that the behavior described by Ms. Richards was "not fully consistent with the medical and other evidence of record." *Id.* With respect to the testimony of Ms. Hood, the ALJ noted the discrepancy between her statement that Plaintiff was unable to use tools, and the statement that what prevented Plaintiff from changing the oil in the tractor was an inability to go out for parts, and with Ms. Richards' statement that Plaintiff was able to do repairs if the

necessary parts were brought to him. *Id.* The ALJ also cited to Dr. Sekiya's chart note indicating

that Plaintiff had no trouble using utensils, punching numbers on a telephone, or writing. *Id.*

At step four, the ALJ found that Plaintiff had the RFC to perform medium work with the

additional limitation to simple tasks of one to three steps involving only occasional and brief

contact with co-workers or the general public, no more than six hours of sitting, standing or

walking in an eight-hour workday, and no work requiring fine manipulation. Tr. 15. The ALJ

found that Plaintiff was unable to perform any past relevant work, but that he was able to do the

jobs identified by the VE: marker II, packing line worker, and bottle packer. Tr. 21.

### III. STANDARD OF REVIEW

The Court must affirm the Commissioner's decision if it is based on proper legal

standards and the findings are supported by substantial evidence in the record. *Meanel v. Apfel*,

172 F.3d 1111, 1113 (9th Cir. 1999). In determining whether the Commissioner's findings are

supported by substantial evidence, the Court must review the administrative record as a whole,

weighing both the evidence that supports and the evidence that detracts from the Commissioner's

conclusion. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's decision

must be upheld even if "the evidence is susceptible to more than one rational interpretation."

*Andrews v. Shalala,* 53 F.3d 1035, 1039-40 (9th Cir. 1995).

The initial burden of proving disability rests on the claimant. *Meanel*, 172 F.3d at 1113.

To meet this burden, the claimant must demonstrate an "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

. . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"

42 U.S.C. § 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from

anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

## IV.  DISCUSSION

Plaintiff asserts that the ALJ erred by: (1) incorrectly adjudicating step three of the sequential evaluation; (2) improperly rejecting the lay witness testimony of Ms. Richards and Ms. Hood; (3) improperly rejecting the opinions of Dr. Cha, Dr. Hoch, Dr. Sekiya, and counselor Ms. Foufos; (4) improperly rejecting Plaintiff's testimony and written statements; (5) incorrectly adjudicating step five of the sequential evaluation; and (6) failing to comply with the mandates of SSR 96-8P.

### A.    Step Three Findings

Plaintiff asserts that the lay evidence of Ms. Richards and Ms. Hood establishes that his impairments equal the "B" and "C" criteria of the Listing of Impairments for mental disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04 (affective disorders), 12.06 (anxiety-related disorders).  Ms. Richards stated that Plaintiff spent most of his time on the couch watching television or reading and did not go out except for counseling and medical appointments and, occasionally, to visit the library. She stated that Plaintiff was paranoid and avoided contact with other people, displaying acute anxiety even around familiar people. Ms. Hood testified that Plaintiff had difficulty walking, did not have the strength to move, worked at a speed 25-50 percent of what a normal person was capable of, and could not concentrate because of his agitation and physical difficulties with strength and endurance. Because, as discussed below, I conclude that the ALJ properly rejected the lay witness testimony, this argument is unpersuasive.

**B.    Lay Witness Testimony**

Plaintiff asserts that the ALJ erred in his rejection of the lay witness testimony. I disagree. Lay testimony as to a claimant's symptoms is competent evidence that the Commissioner must take into account, *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993), unless he or she expressly decides to disregard such testimony, in which case "he must give reasons that are germane to each witness." *Id. See also Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001) and *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006). This standard does not require the ALJ to discuss every witness's testimony on an "individualized, witness-by-witness basis." *Molina v. Astrue,* No. 10-16578,  __ F.3d __, 2012 WL 1071637 *7 (9th Cir. April 2, 2012). Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness. *Id. See also Valentine v. Comm'r Soc. Sec. Admin.,* 574 F.3d 685, 694 (9th Cir. 2009) (because ALJ gave clear and convincing reasons for rejecting claimant's testimony, and lay witness's testimony was similar to claimant's complaints, ALJ also gave germane reasons for rejecting lay witness testimony). The ALJ did not err in rejecting Ms. Hood's statement that Plaintiff was unable to use tools on the basis of its inconsistency with Plaintiff's report to Dr. Sekiya that he had no such difficulties. Nor do I find any error in the ALJ's rejection of Ms. Richards's statements about Plaintiff's fatigue and need to lie down on the basis of contradictory statements from Plaintiff to medical practitioners about having more energy and better sleep with medication. The statements of both witnesses are inconsistent with the medical evidence, including the absence of any clinical findings to support the claims that Plaintiff is physically impaired to the extent that he is

unable to lift more than five pounds, can stand or walk only for brief periods, and needs a long

rest after 30 minutes of exertion. Their statements about Plaintiff's mental and physical

impairments are also contradicted by Plaintiff's reports to his health care providers about family

reunions, trips to Florida, holiday gatherings, installing windows, tiling a shower, canning, doing

tractor repairs, cooking holiday meals, and hosting 50 house guests over a weekend.

## C.    Medical Opinions

Plaintiff asserts that the ALJ erred in rejecting the opinions of Doctors Cha and Hoch and

Ms. Foufos that he was incapable of sustaining employment because they were based on

Plaintiff's own reports and inconsistent with objective medical findings.

As a general rule, the opinions of treating physicians, even when contradicted by other

evidence, may be rejected only if the ALJ provides  "specific and legitimate" reasons supported

by substantial evidence in the record.  *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir.

2001); *Lester v. Chater,*  81 F.3d 821, 830  (9th Cir. 1995).  The ALJ can reject a treating

physician's opinion if the opinion is premised on the claimant's subjective complaints, and the

ALJ has already validly discounted the claimant's complaints. *Fair v. Bowen*, 885 F.2d 597 (9th

Cir. 1989); *Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005).

I find no error in the ALJ's rejection of Dr. Cha's opinions. Dr. Cha specifically noted on

the questionnaire completed in September 2006 that her opinions about Plaintiff's physical

limitations were based on "patient report;" Dr. Cha wrote nothing in response to questions about

what medical findings supported the limitations she described. Tr. 579, 580, 581. Nowhere on

the questionnaire does Dr. Cha offer any medical or clinical findings in support of her very

specific findings that Plaintiff would be absent from work more than four times a month; that he

should avoid even moderate exposure to extreme cold, extreme heat, and noise; that he could lift no more than 10 pounds occasionally; that he was impaired in his ability to push, pull, stoop, crouch, climb stairs, or climb ladders; and that he could stand and walk less than two hours, sit only about two hours, and walk five minutes. Tr. 579-82. The only clinical findings in Dr. Cha's records that suggest physical limitations are a diagnosis of mild muscle strain of the left leg on June 2004 and her notes about Plaintiff's CTS symptoms of the left wrist.

Affirmative evidence contradicting Dr. Cha's opinions is substantial. Dr. Swartztrauber's physical examination on May 16, 2006, was normal through all systems, and she wrote that Plaintiff's headaches had "no definable cause" and were alleviated with aspirin. The case notes dated March 12, 2007, from gastroenterologist Dr. Sheffield indicate normal physical examination and unremarkable lab tests.  Plaintiff's echocardiogram on August 7, 2006 was normal. Angiograms were normal. Plaintiff's medical records reflect that his hypertension was well controlled with medication. *See, e.g.,* tr. 407 (Dr. Cha's notation that Plaintiff's blood pressure was well controlled with medication); tr. 776 (Dr. Khoury's notation that Plaintiff's hypertension was "well controlled").  Plaintiff's complaints of fatigue and hypersomnia were resolved after he was prescribed medications for limb movements during sleep. *See, e.g.,* tr. 487 (Dr. Swartztrauber's note of July 6, 2006, that "Requip has helped his sleep habits tremendously"); tr. 484 (Dr. Loube's notation on July 19, 2006 that Plaintiff had "excellent clinical response" to Requip and reported being "markedly alert during the day," with less fragmented and "much more restorative" sleep; daytime functioning was adequate and hypersomnia was "no longer an issue"); tr. 482 (note by Dr. Cha on July 27, 2006 that Plaintiff "doing well," and that Requip was "helping him sleep and he feels very well rested in the

morning."). *See also* tr. 681 (Dr. Cha's note that Sinemet seemed to be "doing a reasonable job"

for Plaintiff's hypersomnia); tr. 678 (Dr. Loube's notation on February 7, 2007 that after taking

Sinemet for six months, Plaintiff's sleep was "excellent," and he was alert during the day with no

residual hypersomnia).

Nor do I find any error in the ALJ's conclusion that the opinions expressed by Dr. Hoch

and Ms. Foufos on the questionnaires were inconsistent with their treating records. In November

2004, Dr. Hoch noted that Plaintiff's psychiatric symptoms had been "fairly stable" on his

current medications, and that his depressive symptoms were "mild". Tr. 573. In November 2005,

Dr. Hoch wrote that Plaintiff had obtained significant benefits from Celexa. Tr. 570. In March

2005, Dr. Hoch wrote that Plaintiff's depressed mood and anxiety had significantly improved

with a higher dose of Celexa. Tr. 566. On June 10, 2005, Plaintiff told Dr. Hoch he was doing

well since taking Celexa and Dr. Hoch observed that Plaintiff's mood was "OK, his affect was

congruent, and he appeared calm" and denied hallucinations. Tr. 556. On January 18, 2006,

Plaintiff told Dr. Hoch he was doing "quite well," and had been able to handle social situations

"much better." Tr. 533. On March 22, 2006, Plaintiff told Dr. Hoch he had had fun in Florida for

two weeks and was benefitting from his current medications. Tr. 526. On December 5, 2006,

Plaintiff told Dr. Hoch he was handling stress at home and was looking forward to a trip to

Florida. Tr. 859. On December 5, 2007, Plaintiff told Dr. Hoch he had had a "good time" in

Eugene for Thanksgiving. Tr. 914.

Ms. Foufos's opinions, like those of Dr. Cha, are based on Plaintiff's self reports. She

states that "*client describes*" disabling anxiety, sense of dissociation, and need to withdraw, as

well as his history of hallucinations. She writes that Plaintiff's "primary *complaints*" are

anhedonia, lethargy, dissociation, and a need to rest, but these behaviors are not reflected in the observations of Plaintiff reflected by her progress notes. She writes that Plaintiff "*reports*" a period of marked decline, and concludes that "[g]iven *client's presentation of symptoms,* it is not likely that he could sustain employment. (Emphasis added). In addition, many of Plaintiff's self reports contradict Ms. Foufos's assessment.

On October 21, 2005, Plaintiff told Ms. Foufos he had had a "productive week" at home, having installed six windows. Tr. 540. In November 2005, Plaintiff was anticipating a family reunion for his daughter's wedding, tr. 539, accomplishing more at home, and feeling "engaged" during a holiday dinner. Tr. 537, 535. On March 16, 2006, Ms. Foufos wrote that Plaintiff had reported a "successful family reunion," at which he did not require anti-anxiety medication. Tr. 528. On March 22, 2006, Plaintiff said he was benefitting from his current medications, without side effects. Tr. 526. On May 10, 2006, Plaintiff told Ms. Foufos about walking from the library to the clinic and planning to help a neighbor fix a tractor. Tr. 516.

The ALJ's rejection of Dr. Sekiya's opinion that Plaintiff could not function outside a highly supportive living arrangement was also free of error, based on the same substantial evidence cited above, as well as Dr. Sekiya's own records showing that Plaintiff "no longer endorses positive psychotic symptoms," that his auditory hallucinations were gone, and Dr. Sekiya's opinion that Plaintiff did well on his medication regimen.

I conclude that the ALJ's rejection of the opinions of Doctors Cha, Hoch and Sekiya, and of Ms. Foufos are free of legal error and based on substantial evidence in the record.

**D.    Credibility Findings**

Assessing the credibility of a claimant's testimony about subjective pain or the intensity

of symptoms involves a two-step analysis. *Vasquez v. Astrue,* 572 F.3d 586, 591 (9th Cir. 2009).

First, the ALJ determines whether there is "objective medical evidence of an underlying

impairment which could reasonably be expected to produce the pain or other symptoms alleged."

*Id.* If the claimant has presented such evidence, and there is no evidence of malingering,[5] then

the ALJ must give "specific, clear and convincing reasons" for rejecting the claimant's

testimony. *Id.* The ALJ must identify what testimony is not credible and what evidence

undermines the claimant's complaints. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005).

The evidence upon which the ALJ relies must be substantial. *See Reddick*, 157 F.3d at 724 and

*Holohan*, 246 F.3d at 1208 (9th Cir. 2001).

Examples of clear and convincing reasons include conflicting medical evidence, effective

medical treatment, medical noncompliance, inconsistencies either in the claimant's testimony or

between his testimony and his conduct, daily activities inconsistent with the alleged symptoms, a

sparse work history, testimony that is vague or less than candid, and testimony from physicians

and third parties about the nature, severity and effect of the symptoms complained of.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008); *Lingenfelter v. Astrue*, 504 F.3d 1028,

1040 (9th Cir. 2007); *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may

also consider whether the claimant reports participation in everyday activities indicating

---

[5] ALJ Atkins, in his decision dated January 29, 2004, cited to the results of the Minnesota Multi-Phasic Personality Inventory II ("MMPI-II") administered to Plaintiff by Paul Stoltzfus, Psy.D. on April 16, 2003. Tr. 28-29. The ALJ noted that test results revealed an invalid profile, with scores indicating "an extreme exaggeration of symptoms or possible malingering." Tr. 29. Dr. Stoltzfus stated that the results "raised serious questions regarding the claimant's credibility." *Id.* Dr. Stoltzfus opined that Plaintiff had no work-related mental limitations. *Id.* On the basis, in part, of this evidence, ALJ Atkins found Plaintiff's testimony not fully credible. Tr. 30.

capacities that are transferable to a work setting. *Morgan v. Comm'r Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999). Even when those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment. *Turner v. Comm'r of Soc. Sec.,* 613 F.3d 1217, 1225 (9th Cir. 2010); *Valentine,* 574 F.3d at 693.

The ALJ found Plaintiff not entirely credible because his testimony about physical impairments, including an inability to hold tools, high blood pressure, irritability, trembling hands, low back pain, neck pain and stiffness, mental fog, migraine headaches, dizziness, diarrhea, fainting spells, panic attacks, and the necessity of changing position every 20 minutes and elevating his feet most of the day was undermined by: (1) medical evidence of normal physical examinations in 2006 and 2008, with normal vital signs, normal gait, normal and symmetrical muscle strength and tone in all extremities, intact reflexes, sensation and coordination; (2) Plaintiff's report to Dr. Sekiya that he had no trouble using utensils, punching numbers on a telephone, or writing; (3) Dr. Swartrtrauber's notation that Plaintiff's chronic headaches had "no definable cause" and went away with aspirin; (4) the absence of any evidence of heart disease or musculoskeletal impairments; (5) notations that Plaintiff's hypertension was well controlled with medication and (6) Plaintiff's denial of diarrhea, chest pain, palpitations, or headaches to Dr. Khoury in June 2008.

With respect to Plaintiff's alleged back and neck pain, the court notes that ALJ Atkins found in January 2004 that Plaintiff's alleged back pain was not a severe impairment because the record showed only a diagnosis of mild degenerative disc disease at L5-S1, for which Dr. Cha had recommended Tylenol. Tr. 27. The medical evidence before the court does not indicate any

change in that condition since January 2004; nor is there any clinical evidence of a condition that could reasonably be expected to produce pain and stiffness in Plaintiff's neck or chin cramps.

With respect to Plaintiff's alleged mental symptoms, the ALJ found Plaintiff's testimony of difficulty with social functioning and avoidance of social interaction contradicted by frequent notations from mental health providers that Plaintiff's mood was good, his speech was normal, his affect was congruent, he was calm and cooperative, and demonstrated good eye contact. The ALJ found Plaintiff's testimony also undermined by his reports of improved sleep and increased energy, and by such reported activities as shopping, operating a car, going to the library, and taking trips to Florida.

The ALJ's credibility findings are specific and clear and convincing; they identify the portions of Plaintiff's testimony found not credible and are supported by substantial evidence in the record.  I find no error here.

## E.    Step Five Findings

Plaintiff asserts that the ALJ erred by refusing to admit his proffered "vocational evidence," contained at pages 345-55 of the administrative record. The evidence consists of letters written by various agency administrators in response to letters from Plaintiff's attorney and offered as exhibits to a letter from Plaintiff's counsel to the ALJ objecting, on the basis of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), to the ALJ's receiving any vocational testimony from a VE on the subject of numbers of jobs existing in the national economy. Tr. 343-44. The letters indicate that data on the number of jobs by DOT code is not maintained at either the national or state level. Plaintiff asserts that the ALJ erred in rejecting this evidence and that it must therefore be credited as true. Plaintiff argues that the evidence

establishes the Commissioner's failure to meet his burden at step five of showing that the claimant has the RFC to perform a significant number of jobs existing in the national economy.

Plaintiff's argument has been considered and rejected by the Court of Appeals and by this court. The "VE's recognized expertise provides the necessary foundation for his or her testimony." *Bayliss v. Barnhart,* 427 F.3d 1211, 1218 (9th Cir. 2005). Neither the Federal Rules of Evidence nor the *Daubert* standard applies to administrative hearings in Social Security cases. *Id.* at 1218 n. 4. *See also Howard v. Astrue,* 330 Fed. App'x 128 (9th Cir. 2009) (unpublished decision) (letters from various agencies establishing that none gathers the precise information with respect to the availability of jobs to which the VE testified and on which the ALJ relied, submitted by Plaintiff, did not provide significant probative evidence on how many jobs were available in the local and national economies; ALJ properly relied on VE's testimony for that information); *Crane v. Barnhart,* 224 Fed. App'x. 574, 577-78 (9th Cir. 2007) (unpublished decision) (rejecting claimant's challenge under *Daubert* to ALJ's reliance on VE's testimony regarding number of jobs available in the local and national economies, holding that evidence submitted was neither significant nor probative, because it did not provide information about how many jobs were available and even if it had, the ALJ had already relied on a proper source for that information–the VE's testimony, based on the DOT). This court has "repeatedly relied on such reasoning in rejecting this argument." *Penor v. Astrue,* No. 10-cv-1056-HZ, 2011 WL 6778767 *13 (D. Or. Dec. 23, 2011). *See, e.g., Schwanz v. Astrue,* 10-cv-795-HZ, 2011 WL 4501943 *8-9 (D. Or. Sept. 28, 2011), *Jaynes v. Astrue,* 10-cv-568-BR, 2011 WL 1630808 *7 (D. Or. Apr. 29, 2011), *Nelson v. Astrue,* 10-cv-18-MO, 2011 WL 39826 *7 (D. Or. Jan. 5, 2011), *Rakes v. Astrue,* 09-cv-821-BR, 2011 WL 11175 *7 (D. Or. Jan. 3, 2011).

**F.      SSR 96-8P**

Plaintiff asserts that the ALJ's RFC findings are deficient because the ALJ did not

account for limitations identified by medical providers, lay witnesses, and Plaintiff, and because

the ALJ failed to consider all of Plaintiff's impairments, as required by SSR 96-8P, including

CTS, headaches, incontinence and bipolar disorder. I disagree. The ALJ rejected Plaintiff's

testimony about diarrhea and incontinence because he had denied diarrhea when asked about it

by a medical practitioner. In addition, Dr. Sheffield found no clinical evidence of a condition that

could cause fecal incontinence and wondered whether Plaintiff's incontinence was secondary to

his psychiatric symptoms. There is substantial evidence in the record that Plaintiff's anxiety had,

by the time of the ALJ's decision, improved to the point that Plaintiff needed Xanax only on rare

occasions associated with air travel. I therefore find no error in the ALJ's failure to consider the

effect of incontinence. Similarly, Plaintiff's testimony about migraine headaches of several

hours' duration was contradicted by physicians' chart notes that the headaches had no definable

cause and were alleviated with aspirin.

The ALJ's hypothetical to the VE ruled out fine manipulation with the hands, thereby

taking into consideration Plaintiff's mild CTS of the right hand (the CTS in the left hand had

been relieved by carpal tunnel release). The ALJ also asked the VE to consider an individual

limited to simple, routine tasks and requiring only occasional and brief contact with coworkers

and the general public, thereby taking into account Plaintiff's anxiety and bipolar disorder. I find

no error here. For the reasons discussed, the ALJ did not err by failing to incorporate all the

limitations expressed in the questionnaires submitted to Doctors Cha, Hoch, and Sekiya because

the limitations are inconsistent with their own chart notes and with Plaintiff's own statements.

## V.  CONCLUSION

For the forgoing reasons, the Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

DATED this 9th day of April, 2012.

<u>      /s/ Michael H. Simon      </u>

Michael H. Simon
United States District Judge